Argued and submitted January 30, affirmed September 16, 1986

# MARKET TRANSPORT, LTD.,
*Respondent on review/*
*Petitioner on review,*

*v.*

# MAUDLIN,
*Petitioner on review/*
*Respondent on review.*

(TC A8211-07250; CA A31966; SC S32079; SC S32085)

725 P2d 914

W. Benny Won, Assistant Attorney General, Salem, argued the cause for petitioner on review/respondent on review. With him on the petition and response were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, Michael D. Reynolds, Assistant Attorney General and Paul A. Graham, Assistant Attorney General, Salem.

Jeffrey L. Kleinman, Portland, argued the cause for respondent on review/petitioner on review and filed a petition and response.

Before Peterson, Chief Justice, and Lent, Linde, Campbell, Carson and Jones, Justices, and Gillette, Justice Pro Tempore.

GILLETTE, J.

## GILLETTE, J.

This is a weight-mile tax case. The Public Utility Commissioner (Commissioner) issued an order finding that plaintiff had acted as a common carrier with respect to the transport of unregulated goods for its customer, Fred Meyer, Inc., and was therefore responsible for paying a weight-mile tax pursuant to ORS 767.775 *et seq.* Plaintiff then sought review of the Commissioner's order in the circuit court which, after reviewing the Commissioner's order pursuant to ORS 756.580, held that plaintiff had acted only as a broker in the transactions and was therefore not responsible for the weight-mile tax. The Court of Appeals affirmed. The Commissioner on review to this Court seeks reinstatement of his order. We affirm the circuit court and Court of Appeals.

### BACKGROUND

Pursuant to ORS 767.815, all motor carriers using the highways of the state must pay a weight-mile tax which is to be applied "to the cost of administration of this chapter and for the maintenance, operation, construction and reconstruction of public highways." During the relevant time, ORS 767.005[1] defined the terms "broker," "carrier" and "common

---

[1] The definitions in ORS 767.005 were amended by Oregon Laws 1981, chapter 117, section 1, and presently read:

"(1) 'Broker' means any person not a 'motor carrier' or a bona fide employe or agent of any carrier who sells or offers for sale any transportation subject to this chapter, or negotiates for or purports to be one who sells or arranges for such transportation.

"(2) 'Carrier' or 'motor carrier' means common carrier, contract carrier or private carrier.

"* * * * *

"(7) 'Common carrier' means:

"(a) Any person who transports persons or property for hire or who publicly purports to be willing to transport persons or property for hire by motor vehicle; or

"(b) Any person who leases, rents or otherwise provides a motor vehicle to the public and who in connection therewith in the regular course of business provides, procures or arranges for, directly, indirectly or by course of dealing, a driver or operator therefor."

Although the definition of "common carrier" now uses the words "who publicly purports to be" in place of the phrase "who holds himself out to the public as," plaintiff and the Commissioner agree that this change creates no material difference in the definition. For purposes of our analysis, we agree that the change in language has no substantive effect on the definition.

carrier" thus:

"(1) 'Broker' means any person not a 'motor carrier' or bona fide employe or agent of any carrier who sells or offers for sale any transportation subject to this chapter, or negotiates for or purports to be one who sells or arranges for such transportation.

"(2) 'Carrier' or 'motor carrier' means common carrier, contract carrier or private carrier.

"* * * * *

"(7) 'Common carrier' means:

"(a) Any person who transports persons or property for hire or who holds himself out to the public as willing to transport persons or property for hire by motor vehicle; or

"(b) Any person who leases, rents or otherwise provides a motor vehicle to the public and who in connection therewith in the regular course of business provides, procures or arranges for, directly, indirectly or by course of dealing, a driver or operator therefor."

Plaintiff conducts three types of operations. It hauls regulated commodities interstate both as a common carrier under a certificate of authority issued by the Interstate Commerce Commission and as a contract carrier under permits issued by the Interstate Commerce Commission. It also transports in interstate commerce various foodstuffs which are exempted from entry regulation or rate prescription by the Interstate Commerce Commission.

When the Commissioner issued his order, plaintiff owned and operated 42 tractors and 56 trailers. Approximately 85 percent of plaintiff's transport operation is conducted with owned equipment; the remaining portion of its business is conducted with both leased equipment and independently owned and operated equipment. Approximately four percent of plaintiff's yearly gross revenue is derived from transportation services using independently owned and operated equipment.

The Commissioner's staff conducted a Highway Use Tax audit of plaintiff's operations covering the period May 1, 1977, through February 29, 1980. As a result of the audit, additional weight-mile taxes were assessed against plaintiff. With penalties and interest, the total assessment was

$10,509.69. Plaintiff agreed with and paid the additional taxes which it conceded were properly assessed on all hauls made with vehicles it owned and on hauls made by vehicles which it had leased. However, plaintiff contested the assessment of taxes totaling $4,426.51 on 34 trips made in June, 1979, which it claims is attributable to brokerage activities for its customer, Fred Meyer, Inc. It requested a hearing as to those trips and that amount.

The hearing was held on January 16, 1981, before a hearings officer. On October 8, 1981, the officer issued a proposed order which contained extensive findings of fact and conclusions of law. The proposed order concluded that plaintiff had acted as a broker with regard to the hauls in question and therefore was not liable for the assessed taxes. The Commissioner's staff filed exceptions to the proposed order and, on October 1, 1982, the Commissioner entered Order No. 82-692 holding plaintiff liable for payment of the assessed taxes.[2]

The Commissioner found that plaintiff had an agreement with Fred Meyer under which plaintiff would transport for Fred Meyer ICC exempt and regulated commodities out of specific areas to and from California and Oregon. In carrying out its obligations to Fred Meyer, plaintiff used both leased and independently owned and operated equipment. The hauls conducted with leased equipment are not in issue.

The Commissioner found that Fred Meyer provided plaintiff with the name of the shipper, the load, the destination, and the date of pickup. Fred Meyer did not specify how plaintiff should move the loads, although Fred Meyer's traffic manager was familiar with the services offered by plaintiff. He had used plaintiff's common carrier service and "brokerage" service in the past. Fred Meyer used other "brokers" and expected service identical to that provided by plaintiff. The only concern of Fred Meyer was that shipments arrive in a timely manner and in good condition. If goods were damaged, Fred Meyer is not concerned with how damages were paid or who paid them but it would look to plaintiff for settlement. Although plaintiff did not insure underlying operators, it

---

[2] The Commissioner is authorized to reject any proposed order and prepare a different order. OAR 860-14-092(6).

would expand its group cargo insurance policy to cover independent operators who, in turn, reimbursed plaintiff for the coverage.

The Commissioner found that, when plaintiff used independent operators, it would secure and arrange for transportation, handle all claims, process paperwork and tender to the operator certain fees and other intermediate charges. The Commissioner also found that it was the practice of plaintiff and other "brokers" to provide lists of published tariff rates for unregulated commodities to its customers and to advance certain incidental funds for fuel, repairs and labor. Operators then reimbursed plaintiff for all advances, claims and shortages. The Commissioner found that plaintiff, like other "brokers," settled its claims with the actual carrier, independently of the customer.

The Commissioner concluded that, in all significant respects, the relationship between plaintiff and a shipper and its control over the transport of goods were identical, whether the transport was "brokered" or performed with leased equipment. Finding that plaintiff conducted itself in conformance with criteria he formulated, the Commissioner concluded that plaintiff had acted as a common carrier and was therefore responsible for the additional assessed weight-mile taxes.

The present litigation began when plaintiff filed an action pursuant to ORS 756.580 to set aside the findings and order of the Commissioner. The circuit court entered judgment for plaintiff. The Commissioner appealed to the Court of Appeals, which affirmed the circuit court. *Market Transport v. Lobdell,* 74 Or App 375, 703 P2d 1032 (1985). We granted review to determine whether the Court of Appeals had applied the appropriate test of brokerage.

## SCOPE OF REVIEW

Proceedings of the Commissioner are exempt from the provisions of the Administrative Procedures Act (APA), ORS 183.315(1), but are instead governed by chapter 756 of the Oregon Revised Statutes. A party wishing to challenge an order of the PUC must proceed pursuant to ORS 756.580(1), which provides:

"(1)    A party to any proceeding before the commissioner, when aggrieved by any findings of fact, conclusions of law or

order, including the dismissal of any complaint or application by the commissioner, may prosecute a suit against the commissioner to modify, vacate or set aside such findings of fact, conclusions of law or order."

Two other sections are pertinent to a court's scope of review:

"In any suit referred to in ORS 756.580, the burden of proof is upon the party seeking to modify, vacate or set aside findings of fact, conclusions of law or the order to show by clear and satisfactory evidence that the order is unreasonable or unlawful." ORS 756.594.

"Court review of any findings of fact, conclusions of law or order referred to in ORS 756.580, shall be conducted by the court without a jury, but the court shall not substitute its judgment for that of the commissioner as to any finding of fact supported by substantial evidence. The review shall be confined to the record and no additional evidence shall be received except as provided in ORS 756.600 or except to show alleged irregularities in procedure before the commissioner not shown in the record. The court may affirm, modify, reverse or remand the order." ORS 756.598(1).

■ Under these statutory provisions, a party seeking to overturn findings of fact of the Commissioner has a heavy burden because of the unusual statutory scheme governing that agency. This court noted in *Dickinson v. Davis,* 277 Or 665, 561 P2d 1019 (1977), that the combined effect of ORS 756.594 and 756.598 requires an aggrieved party not only to show by clear and satisfactory evidence that the Commissioner's order is unreasonable or unlawful but also that any challenged findings contained therein are not supported by substantial evidence. 277 Or at 669. A plaintiff is further hindered by the requirement that the evidence is limited, with few exceptions, to that developed in the administrative record. ORS 756.598(1). The circuit court nonetheless found that plaintiff had borne its burden of proof to "show by clear and satisfactory evidence that defendant's Order No. 82-692 is unreasonable or unlawful and not supported by substantial evidence on the record * * *," and reversed the Commissioner's order.

On appeal by the Commissioner, the Court of Appeals acknowledged that it could not substitute its judgment for that of the Commissioner if the latter's findings of fact were supported by substantial evidence. However, the

Court of Appeals stated an additional requirement on review of the order:

> "The Commissioner's order must disclose a rational relationship between the findings of fact and legal conclusions sufficient to demonstrate that the action was not arbitrary. We need not agree with the Commissioner's inferences or reasoning in order to uphold the order, if it contains findings and conclusions sufficient to allow us to determine whether the reasoning is rational and to test the agency's actions against its grant of power. *American Can v. Lobdell,* 55 Or App 451, 461, 638 P2d 1152, *rev den* 293 Or 190 (1982)." 74 Or App at 377.

The requirement recognized by the Court of Appeals has been enunciated by this Court on a number of occasions and is a corollary to the substantial evidence rule, the rule which the legislature, in enacting ORS 756.598, intended to adopt as the standard for review of findings of fact by the Commissioner. *See* Advisory Committee on Public Utility and Carrier Law Revision, Preliminary Draft 58-59 (1970).

In *City of Roseburg v. Roseburg City Firefighters,* 292 Or 266, 271-72, 639 P2d 90 (1981), this court stated:

> "The substantial evidence rule is not entirely dispositive in reviewing findings which embody inferences. An inference has two parts: a primary fact plus a deduction. The evidence directly establishes only the truth of the primary fact or facts from which an inference may be derived * * *. Rational bases may exist for more than one inference to be drawn from the same primary fact, and the factfinder (*i.e.,* the agency) has the task to decide which one to draw. The court does not substitute its judgment as to which inference should be drawn, but it must review for the existence of a rationale. The rationale is reviewed for soundness, not for conformity to judicial preference. Judicial review of an inference is thus in two stages: (1) whether the basic fact or facts are supported by substantial evidence, and (2) whether there is a basis in reason connecting the inference to the facts from which it is derived. It is a twofold review for substantial evidence and, in a sense, for 'substantial reason,' *cf. Springfield Education Assn. v. School Dist.,* 290 Or 217, 228, 621 P2d 547 (1980), and *McCann v. OLCC,* 27 Or App 487, 495, 556 P2d 973 (1976), *rev den* 277 Or 99 (1977).

> "On judicial review, the court will not substitute its judgment for that of the agency in drawing an inference, but

the court must be satisfied that agency judgment has actually been exercised. Sometimes a rational nexus between an evidenced fact and an inference drawn from it is obvious from common experience (*e.g.,* we may infer from the fact of a wet street that it recently rained). In other cases, however, and particularly in cases involving expertise, the reasoning is not obvious (*e.g.,* we may infer from present meteorological conditions that it will snow tomorrow). In such an inference, we will not assume the existence of a rationale. Rather, we look to the order to state the rational basis of the agency's inference. The explanation need not be complex, but it should be sufficient to demonstrate the existence of a rational basis and to allow for judicial review." (Footnote omitted; citations omitted.)

*See also Ross v. Springfield School Dist No 19,* 294 Or 357, 370, 657 P2d 188 (1982); *Springfield Education Assn v. School Dist,* 290 Or 217, 235, 621 P2d 547 (1980); *Dickinson v. Davis, supra,* 277 Or at 674-75. We apply the *City of Roseburg* methodology in scrutinizing the order in this case.

## *THE COMMISSIONER'S ORDER*

The issue is straightforward: As to the independently owned and operated hauls, is plaintiff a common carrier or a broker? If the former, it owes the tax; if the latter, it does not owe the tax. The Commissioner's order puts forth criteria which he states should be considered in determining whether a person is acting as a "carrier":

"If an entity holds itself out to arrange for and perform the transportation, accepts the responsibility for the timely pickup and delivery of the commodities, insures and handles all loss and damage claims, bills the shipper as the carrier, and purports to act only for itself and not as an agent for a third party, then that entity may be found to be acting as a carrier."

The Court of Appeals agreed with the Commissioner's assertion that the "criteria are reasonable and consistent with the statutory definition of the term 'carrier'," but held that the order lacked any findings of fact to show that plaintiff held itself out to "perform" the transportation and, on that basis, affirmed the trial court. 74 Or App at 380-81. For the reasons which follow, we agree with the conclusion of the Court of Appeals as to insufficient findings of fact, but disagree with the Court of Appeals' conclusion that the Commissioner's formulation of the "carrier" criteria is reasonable and consistent with the statutory definition.

The formulation of the criteria by the Commissioner in this case necessarily involved the Commissioner's interpretation of the statutory terms. In *Springfield Education Assn v. School Dist, supra,* we discussed and divided statutory terms into three classes,[3] with each class delegating to an agency a different responsibility in applying the statute. Under the *Springfield* analysis, we find the terms "carrier," "common carrier" and "broker" to be "inexact terms" in the sense that they require factfinding in order to insure they are being applied in a manner consistent with legislative policy. In that regard, this court said in *Springfield:*

> "In saying that the legislature has completely stated its meaning and that the court ultimately discerns and applies that meaning as a matter of law, we recognize that imprecise terms in this second class are capable of contradictory applications, all of which are within the dictionary meanings of the term. We refer to the legislature having expressed itself not in the semantic sense, but rather in the sense of having made a complete policy statement. Whether any possible meaning comes within the intended meaning depends upon the policy which the word or phrase is intended to convey. Thus, when we refer to a term representing a complete legislative expression, we refer to a completed legislative policy judgment having been made.

> "Whether certain facts are within the intended meaning depends upon the policy that inheres in the term by its use in a statute which is intended to accomplish certain legislative purposes." 290 Or at 225.

■ The Commissioner may interpret statutory terms by order or through the promulgation of rules. Because an interpretation by order represents an agency's determination that the statutory interpretation is within some expressed legislative policy, that instrument must also offer the Commissioner's rationale "demonstrating the tendency of the

---

[3] In *Springfield Education Assn v. School Dist,* 290 Or.217, 223, 621 P2d 547 (1980), the following categories of statutory terms were enunciated:

"1.) Terms of precise meaning, whether of common or technical parlance, requiring only factfinding by the agency and judicial review for substantial evidence;

"2.) Inexact terms which require agency interpretation and judicial review for consistency with legislative policy; and

"3.) Terms of delegation which require legislative policy determination by the agency and judicial review of whether that policy is within the delegation."

order to advance the policy embodied in the words of the statute." *Springfield Education Assn v. School Dist, supra,* 290 Or at 228. Here, the Commissioner's order purports to interpret the term "common carrier" by formulating criteria to be applied to the particular facts in each case. We find the Commissioner's order defective because the criteria it pronounces are not consistent with the legislative policy inhering in the statute.

The terms "carrier," "common carrier" and "broker" have been expressly defined by the legislature. ORS 767.005. In addition, they appear within a broad statutory scheme which encompasses the regulation of the motor carrier industry within the state. The administration of this chapter and all relevant statutes is the responsibility of the Commissioner, ORS 756.040, who must construe such laws "liberally." ORS 756.062(2). Many of the terms and concepts used in the motor carrier statutes originated in common law. *See, e.g.,* ORS 756.200 (duties and liabilities of, and remedies against, public utilities and carriers remain the same as prescribed by common law). The Commissioner acknowledged at oral argument that the terms "common carrier" and "broker" are two such terms.

The Commissioner first argues that plaintiff meets the requirements of the "holding out" test stated in the definition of "common carrier," ORS 767.005(7). That section provided, at the relevant time:

" 'Common carrier' means:

"(a) Any person who transports persons or property for hire or who holds himself out to the public as willing to transport persons or property for hire by motor vehicle; or

"(b) Any person who leases, rents or otherwise provides a motor vehicle to the public and who in connection therewith in the regular course of business provides, procures or arranges for, directly, indirectly or by course of dealing, a driver or operator therefor."

As we read the language, the statute applies only to a person who *actually* transports persons or property *or* who holds himself out to the public *generally* to transport persons or property. This reading of the statute is consistent with the common-law definition of a common carrier.

■        At common law, a common carrier was one who was obligated to transport goods by any who would hire him. In *Anderson v. Smith-Powers Logging Co.*, 71 Or 276, 283, 139 P 736 (1914), this court stated:

> "To bring a person within the description of common carrier, he must exercise the business as a public employment; he must undertake to carry goods for persons generally, and hold himself out as ready to transport goods for hire as a business, not as a casual occupation. A common carrier may therefore be defined as one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to all such as choose to employ him and pay his charges."

*See also Honeyman v. Oregon RR Co.*, 13 Or 352, 353-54, 10 P 628 (1886); I Hutchinson, Law of Carriers § 48, at 42-43 (3d ed 1906). The statutory language has paralleled this description, at least until 1977. And, although the language was changed in 1977, Oregon Laws 1977, chapter 253, section 2, the changes were the result of an overall move to consolidate and simplify the motor carrier statutes. *See* House State Government Operations Committee, May 17, 1977, Minutes, Exhibit A, p 1. The section defining "common carrier" was merely earmarked for "language cleanup" with no apparent intent to change its substantive impact. *Id.* at 2.

■        The determinative factor at common law and as presently retained in ORS 767.005(7)(a) is thus whether the person either "transports" or "holds himself out to the public as willing to transport" persons or property for hire. We are only concerned with the latter criterion in this case, as there is no claim that plaintiff actually transported the goods.

One commentator offered the following definition of the "holding out" test for common carriage:

> "In distinguishing common carriage from contract carriage, the ultimate test of common carrier status is the nature of the holding out to the public, which may involve many factors, no one of which is controlling in all circumstances. *Each case requiring a determination whether or not common carriage exists, when brought to its irreducible minimum, turns finally on this question of whether or not a holding out to the public generally is shown.* The difficulty in particular cases arises from the generality of this controlling consideration. Advertising in newspapers and telephone directories,

maintaining contacts with old patrons and active personal solicitation - these may constitute a holding out to serve the public generally. However, holding oneself out to the public does not necessarily consist in public declarations or advertisements; the undertaking may be evidenced by the carrier's own notice or actions, as by his known habitual continuance in the business." Kahn, Principles of Motor Carrier Regulation 5 (1958). (Emphasis added.)

■ The crucial element is therefore whether the person holds himself out to the public *generally*. As previously noted, the plain language of the statute also requires that the person hold himself out *actually* to transport the goods in question. We find no evidence in the record to indicate that plaintiff held itself out to anyone, let alone to Fred Meyer, that it would perform the transportation.

In this sense, the Court of Appeals was correct in focusing on the words "and perform" in the Commissioner's order. The Court of Appeals held:

"The Commissioner's order does not include a finding that plaintiff held itself out 'to arrange for *and perform* the transportation * * *.' (Emphasis supplied.) The Commissioner would infer a holding out 'to perform' from the findings regarding the transportation arrangement between Fred Meyer and plaintiff. Those extensive findings focus on Fred Meyer's complete delegation of control and responsibility to plaintiff and its indifference to, and ignorance of, the means by which the transport of goods was to be performed. They do not, by necessity, lead to the conclusion that plaintiff held itself out or agreed *to perform* the actual moving of the goods. The most that can be drawn from the facts is that plaintiff agreed to ensure that the goods would get transported.

"We agree with the Commissioner that a carrier is one that holds itself out *to perform* transportation or, under the statutory definition 'to transport persons or property * * *.' *Former* ORS 767.005. The apparent arrangement here is distinct from that described in the statute, even though the distinction is subtle. Any broker might participate in such an arrangement without representing a willingness to become actually involved in moving the goods. The distinction makes the difference. There are no findings that plaintiff held itself out to Fred Meyer to execute the agreement by performing the transportation. Under the Commissioner's own test, plaintiff's conduct was not sufficient to permit it to be characterized as a carrier." 74 Or App at 380-81.

We agree with the Court of Appeals' analysis of the Commissioner's criterion to the extent that a person must hold himself out actually to perform the transportation. We must add, however, that the holding out must be to the public *generally*. The Commissioner's criterion as announced in his order does not include this necessary element.

A second reason supporting the invalidation of the Commissioner's order is that it is inconsistent with legislative policy because it ignores the definition of a "broker" in its formulation and application:

> "A transportation broker is one who acts merely as an intermediary between shipper or traveler and carrier and is paid a commission or like compensation for bringing the two parties together and arranging for the transportation. He uses his own discretion in using the services of the carriers for whom he arranges traffic, which carriers may operate in the same territory and consequently are more or less in competition with each other. Nevertheless every broker is in a sense an agent, though not every agent is a broker. The chief distinguishing feature is that a broker generally acts in a certain sense as agent for both parties to a particular transaction. *He sells and offers for sale transportation subject to the Act, makes contracts, agreements and arrangements, and holds himself out to provide, procure, furnish and arrange for transportation.*" Kahn, Principles of Motor Carrier Regulation, *supra*, at 10. (Emphasis added; footnotes omitted.)

This definition is consistent with the definition of "broker" found in ORS 767.005(1) and in the common law.

Were we to accept the Commissioner's criteria, they would render a nullity ORS 767.005(1), the statutory definition of "broker." The circuit court recognized this very point in its ruling:

> "The Commissioner's determination simply is based entirely on the statutory definition of a carrier — a common carrier and ignores the statutory definition of a broker.

> "The problem is presented by the statute in that if all we had was the common carrier's statute there would be no question but what not only Market Transport but probably all other brokers would be common carriers.

> "* * * * *

> "* * * [U]nder the Commissioner's determination, it seems to me that if we had no statutory definition of a broker then anyone who offers for sale any transportation services would

be holding themselves out to the public as willing to transport, and there would be no such thing as a broker.

"We would only have common carriers. However, the Legislature has provided for two categories, and they really haven't given us much to determine the difference.

"One is holding out and the other is holding for sale, and in this instance the Commissioner attaches great significance to the fact that the broker, Market Transport, is the one who handles the claims, but the Commissioner himself acknowledges in his order that is something that is done by a broker.

"Of course, that's quite reasonable from the shipper's standpoint, the fact that the shipper may not know whether a particular load is being brokered or handled as a common carrier.

"Now, maybe it will be important that shippers know the difference when they are dealing with a carrier or a broker, but the Legislature has not seen fit to include that as part of the definition, and there doesn't seem to be any regulation that requires the brokers to make that clear.

"And factually, it can hardly be argued that the person for whom the shipment was made in this instance did not understand that the loads were being brokered since the witness used that term in his testimony."

▪ Although it is clear that the statutory terms are mutually exclusive, in the sense that a person cannot be both a broker and a carrier for any one transaction, the terms should be read together in the context of the entire statutory scheme. Thus, while the distinction between a "broker" and a "common carrier" is subtle — a common carrier either actually performs or represents to the public that he will actually perform the transportation, while a broker may be involved in myriad activities short of actual performance or offer to perform[4] — it is a distinction rooted in common-law princi-

---

[4] The Commissioner's criterion also appears to be inconsistent with rules promulgated by him under his authority to regulate brokers. OAR 860-62-210(3), in effect at the time the Commissioner issued the order in this case, appears to contradict the Commissioner's position regarding his view of the limited role of a "broker." It provides:

"A broker shall exercise due diligence:

"(a) To carry out any undertaking to arrange for desired transportation;

"(b) To carry out the terms of its arrangements with any shipper or motor carrier; and

"(c) To pay the carrier promptly any monies due the carrier received by the broker from the shipper."

ples and retained by our legislature. It is a distinction which, as the Court of Appeals stated, "makes the difference." *Market Transport v. Lobdell, supra,* 74 Or App at 381. The Commissioner's criteria neglect to take the definition of "broker" into consideration and, therefore, are defective. The Court of Appeals is affirmed.

Plaintiff also challenges the Court of Appeals' reversal of an award of attorney fees pursuant to ORS 182.090(1). We agree with the Court of Appeals that the application of the law to the facts in this case was not so clear that it can be said that the Commissioner's order lacked a reasonable basis in law or fact.

Affirmed.